```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

GEORGE L. PAGAN,                      :

                   Plaintiff,    :    15 Civ. 3117 (HBP)

     -against-                   :    OPINION AND
                                      ORDER
CAROLYN W. COLVIN, ACTING,       :
COMMISSIONER, Social
Security Administration,         :

                   Defendant.    :

----------------------------------X
```

PITMAN, United States Magistrate Judge:

I.  Introduction

Plaintiff brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for supplemental security income ("SSI").  The parties have consented to my exercising plenary jurisdiction in this matter pursuant to 28 U.S.C. § 636(c) (D.I. 8).  Plaintiff and the Commissioner have both moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (Docket Items ("D.I.") 18, 20).  For the reasons set forth below, the plaintiff's motion

for judgment on the pleadings is denied and the Commissioner's motion is granted.

II.   Facts[1]

    A.   Procedural Background

       Plaintiff filed an application for SSI on February 21, 2012 alleging disability due to stage IV Hodgkin's lymphoma cancer, depression, attention deficit hyperactivity disorder, a back injury, hypertension, high cholesterol, an intestinal infection, acid reflux and asthma (Tr. 55, 170).  Plaintiff alleged a disability onset date of October 27, 2011 (Tr. 152, 170).  His application was initially denied on May 9, 2012 (Tr. 56-61).  Plaintiff requested an administrative hearing, which was held on October 2, 2013, before Administrative Law Judge ("ALJ") Hilton R. Miller (Tr. 27-54, 66-68).  Plaintiff testified at the hearing and was represented by counsel (Tr. 27-46).  The ALJ issued a decision adverse to plaintiff on November 15, 2013 (Tr. 9-22).  The ALJ's determination became the Commissioner's final

---

[1]I recite only those facts relevant to my review.  The administrative record that the Commissioner filed pursuant to 42 U.S.C. § 405(g) (See Notice of Filing of Administrative Record, dated July 26, 2015 (Docket Item 15) ("Tr.")) more fully sets out plaintiff's medical history.

decision on March 19, 2015 when the Appeals Council denied plaintiff's request for review (Tr. 1-4).

B.  <u>Social Background</u>

Plaintiff was born in 1973 and was 38 years old on his application date (Tr. 12-22, 152).  Plaintiff attended high school for one year and received a General Education Diploma in August 1998 (Tr. 20, 171).  Plaintiff was incarcerated for ten to fifteen years and, during this period, he received a bachelor's degree from Skidmore College (Tr. 33, 339-40, 366).  There is no clear indication of the dates of plaintiff's incarceration(s) in the record.

Plaintiff reported that he worked in construction from April 2002 through May 2005, working six hours a day for five days a week (Tr. 171).  Plaintiff also did maintenance work at a cleaning company from June 2009 through October 2009 for eight hours a day for four days per week (Tr. 171).  Plaintiff reported that he last worked as a telemarketer selling telephones and jewelry from August 2011 through October 2011 for four hours a day for five days per week (Tr. 171).  Plaintiff indicated that he stopped working at this last job because he was diagnosed with lymphoma (Tr. 171, 339).

Plaintiff is married and lives in a shelter in the
Bronx with his wife, mother-in-law and his son who is under the
age of eighteen (Tr. 51, 202, 262, 339).  Plaintiff also has one
child over the age of eighteen who does not live with him (Tr.
279).  Plaintiff's current wife works as a home health aide (Tr.
34).  Plaintiff had previously cared for his sick mother until
her death in 2012 (Tr. 30, 278-79, 532).

C.   <u>Medical Background</u>

The medical record reflects plaintiff's physical and
mental health treatment as well as the opinions of consulting
doctors.

   1.   Non-Psychiatric
        <u>Medical Record</u>

Plaintiff was diagnosed with Hodgkin's lymphoma in
October 2011 and was hospitalized for treatment in October,
November and December 2011 (Tr. 251-55, 403-08, 422-36).

On January 31, 2012, plaintiff was treated for Hodg-
kin's lymphoma with abdominal pain (Tr. 492).  In February 2012,
Dr. Steven Horwitz reported that plaintiff was being treated for
Hodgkin's lymphoma at Memorial Sloan-Kettering Cancer Center (Tr.
199).  Dr. Horwitz reported that plaintiff would require "fre-

4

quent office and treatment visits, as well as routine blood work" (Tr. 199). Plaintiff followed up with Dr. Horwitz on February 13 and 20 of 2012 (Tr. 258-61, 307-14). On February 13, 2012, plaintiff received his fifth cycle of chemotherapy and was reported to be "doing well" and feeling better, with improved energy (Tr. 258).

On March 2, 2012, Dr. I. Seok conducted a physical residual functional capacity assessment of plaintiff (Tr. 333-38). Dr. Seok opined that plaintiff could occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk (with normal breaks) for a total of about six hours in an eight hour day and sit (with normal breaks) for a total of about six hours in an eight hour day (Tr. 334). With respect to plaintiff's Hodgkin's lymphoma, Dr. Seok noted that plaintiff was currently doing well, feeling much better and had completed the treatment course, which "leads him to remission" (Tr. 334).

Following a June 27, 2012 visit, Dr. Sardar noted that plaintiff had myalgia,[2] muscle spasms, low back pain and lumbar radiculopathy[3] (Tr. 534). Dr. Sardar recommended that plaintiff

---

[2]Myalgia refers to pain in a muscle or muscles. Dorland's Illustrated Medical Dictionary, ("Dorland's") at 1214 (32nd ed. 2012).

[3]Radiculopathy is a disease of the nerve roots. Dorland's at 1571.

attend physical therapy and gave plaintiff a lidocaine injection (Tr. 534). Dr. Sardar also noted that plaintiff appeared mildly depressed with "blunted affect" (Tr. 533). Dr. Sardar's notes indicate that plaintiff was able to walk independently, although with a slow gait and mild difficulty and that he did not need any assistive device for walking (Tr. 533). Dr. Sardar noted that plaintiff was unable to stand on his toes and heels (Tr. 533).

Dr. Sardar noted again on July 18 and August 15, 2012 that plaintiff did not require any assistive devices for walking (Tr. 535, 537, 539, 541, 542).

On August 8, 2012, a radiology report of plaintiff's cervical spine revealed straightening of the normal cervical lordosis[4] (Tr. 490).

On August 29, 2012 plaintiff purchased a rollator[5] from a medical supply store (Tr. 560).

Dr. Sardar again noted on September 5, September 27 and October 17, 2012 that plaintiff did not require any assistive devices for walking (Tr. 535, 537, 539, 541, 542). At the October visit, Dr. Sardar recommended that plaintiff re-start

---

[4]Lordosis refers to a concave portion of the vertebral column as seen from the side. Dorland's at 1074.

[5]A rollator is a walker equipped with wheels so that it does not need to be lifted from the ground as its user walks. Dorland's at 1652.

physical therapy treatment and prescribed a back and front brace (Tr. 542).

On November 6, November 28 and December 19, 2012, as well as on January 16, February 4, February 25, March 18 and April 11, 2013, Dr. Sardar noted that plaintiff was able to walk using an assistive device and had "a slow gait, [and had] diffi-culties in standing and walking without [the] assistive device" (Tr. 544, 546, 548, 550, 551, 553, 555, 557). Plaintiff's standing balance continued to be "fair" and his sitting balance was "good" (Tr. 544, 546, 548, 550, 551, 553, 555, 557).

On June 10, 2013, plaintiff was hospitalized overnight for abdominal pain, nausea and vomiting (Tr. 438). Plaintiff was given an IV and was discharged after remaining stable without evidence of bleeding (Tr. 438).

In July 2013, plaintiff had CAT[6] scans of his abdomen pelvis, head and neck. Plaintiff had the CAT scan of his abdomen and pelvis as a result of his complaints of of abdominal pain associated with his Hodgkin's lymphoma and to check for a possi-

---

[6]A computed axial tomography (CAT) or "computerized tomogra-phy (CT) scan combines a series of X-ray images taken from different angles and uses computer processing to create cross-sectional images, or slices, of the bones, blood vessels and soft tissues inside your body." See CT Scan, Mayo Clinic (March 25, 2015), http://www.mayoclinic.org/tests-proce-dures/ct-scan/basics/definition/prc-20014610.

ble obstruction; the scan did not reveal any abnormalities that
would account for plaintiff's pain (Tr. 477-78).  Plaintiff had
the CAT scan of his head to "evaluate whether there was
intracranial pathology" after plaintiff fell (Tr. 475-76).  The
scan revealed no acute intra-cranial hemorrhage or infraction
(Tr. 475).  A CAT scan of plaintiff's neck did not reveal any
acute fracture or dislocation (Tr. 481-82).

From June 10 through June 11, 2013 plaintiff was
admitted to the hospital for treatment of Hodgkin's lymphoma, his
abdominal pain, nausea and vomiting (Tr. 438-439). The discharge
notes indicated that plaintiff "smelled of alcohol and was
combative w/staff and security.  Police were called" (Tr. 438).
Plaintiff "was placed on 1:1 companionship for safety purpose"
(Tr. 438).  Plaintiff was discharged in stable condition and sent
for a psychiatry consultation (Tr. 439).

2.  <u>Psychiatric Medical Record</u>

a.  <u>Dr. Jimmie C. Holland</u>

The record contains a March 27, 2012 psychiatric note
from Dr. Jimmie C. Holland of Memorial Sloan-Kettering Cancer
Center (Tr. 511).  Plaintiff's "chief complaints" were listed as
"anxiety, mood swing" (Tr. 511).  Dr. Holland noted that plain-

8

tiff reported feeling overwhelmed by a number of psychosocial stressors over the past three weeks and further reported feelings of irritability, being upset, stress, depression, anxiety, increased energy, racing thoughts, inability to focus and insomnia (Tr. 511). Plaintiff reported engaging in self-injurious behavior (biting his arm or pinching himself) to "feel something" (Tr. 511). Dr. Holland noted that plaintiff had an "[e]xcellent response for sleep and irritability with Zyprexa in the past" (Tr. 512). Dr. Holland noted that plaintiff's appearance "appears healthy" and that his gait and station and muscle strength and tone were "within normal limits" (Tr. 513). Dr. Holland diagnosed plaintiff with substance-induced mood disorder, steroid-induced mood disorder, antisocial traits, Hodgkin's disease, problems with his primary support group, occupational problems and economic problems (Tr. 514). Dr. Holland assigned plaintiff a Global Assessment Functioning ("GAF") score of 55 (Tr. 514).[7]

---

[7]"The GAF is a scale promulgated by the American Psychiatric Association to assist 'in tracking the clinical progress of individuals [with psychological problems] in global terms.'" Kohler v. Astrue, 546 F.3d 260, 262 n.1 (2d Cir. 2008), quoting Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, at 32 (4th ed. 2000)). A score of 51-60 indicates moderate symptoms and a score of 41-50 indicates serious symptoms. See Global Assessment of Functioning, New York State Office of Mental Health, available at https://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf (last visited Sept. 28, 2016).

b.  Dr. Dmitri Bougakov

On April 13, 2012, Dr. Dmitri Bougakov, a psychologist at Industrial Medicine Associates, P.C., conducted a psychiatric evaluation of plaintiff (Tr. 339-42).  Plaintiff reported difficulty concentrating, difficulty falling asleep and dysphoric moods (Tr. 339-40).  Plaintiff reported to Dr. Bougakov that he was able to dress, bathe and groom himself and received assistance from his family for chores (Tr. 341).  Dr. Bougakov observed that plaintiff walked with a cane and had normal posture; plaintiff reported to Dr. Bougakov that he was able to take public transportation (Tr. 340-41).  Dr. Bougakov observed that plaintiff was cooperative and related adequately (Tr. 340). Plaintiff was coherent and goal-directed, his affect was of full range and appropriate in speech and that his mood was "neutral" (Tr. 340).  Dr. Bougakov concluded that plaintiff's memory skills were mildly impaired and that his intellectual functioning was in the average range (Tr. 341).  Although Dr. Bougakov concluded that plaintiff was limited in his ability to learn new tasks and could not perform complex tasks, plaintiff was able to follow and understand simple directions and instructions, perform simple tasks, maintain attention and concentration, maintain a regular schedule and make appropriate decisions (Tr. 341).  Dr. Bougakov

10

noted plaintiff's "mild limitation in the ability to deal with others and deal with stress," and attributed plaintiff's difficulties to psychiatric symptoms (Tr. 341).  Dr. Bougakov concluded that although plaintiff had psychiatric and substance dependence problems, these issues, by themselves did "not appear to be significant enough to interfere with [plaintiff's] ability to function on a daily basis" (Tr. 341-42).  Plaintiff was diagnosed with adjustment disorder with depressed mood, opioid dependence, benzodiazepine abuse in remission, Hodgkin's lymphoma, asthma and hypertension (Tr. 342).  Dr. Bougakov's prognosis for plaintiff was "guarded to fair given the fact that [plaintiff did] report a significant medical condition in its acute stage."  Dr. Bougakov found plaintiff's "psychiatric and cognitive symptoms [to be] relatively mild" (Tr. 342).

c.  Dr. R. Altmansberger

On May 7, 2012, consulting psychologist Dr. R. Altmansberger completed a "psychiatric review technique" and a "mental residual functional capacity assessment" for plaintiff based solely on a review of plaintiff's medical record (Tr. 343-56).[8]  Dr. Altmansberger diagnosed plaintiff with adjustment

---

[8]Plaintiff states that Dr. Altmansberger did not examine him
(continued...)

11

disorder with depressed mood (Tr. 346, 357). Dr. Altmansberger rated plaintiff's functional limitations, and concluded that plaintiff had a mild degree of limitation with respect to the activities of daily living and that he had difficulties in maintaining social functioning (Tr. 353). Plaintiff had moderate limitations with respect to maintaining concentration, persis- tence, or pace (Tr. 353). Dr. Altmansberger noted moderate limitations on plaintiff's ability to maintain attention and concentration for extended periods, to work in coordination with or proximity to others without being distracted by them, to accept instructions and to respond appropriately to criticism from supervisors and to respond appropriately to changes in the work setting (Tr. 357-58). Dr. Altmansberger noted that plain- tiff's motor behavior was "somewhat restless," his thought processes were coherent and goal directed, and that plaintiff had a full range of affect and a neutral mood (Tr. 359). Plaintiff reported that he could travel by public transportation on his own

---

[8](...continued)
(Plaintiff's Memorandum of Law in Support of Motion for Judgment on the Pleadings, dated November 10, 2015, (D.I. 19) ("Pl. Mem.") at 6) and the Commissioner does not dispute this statement. However, it is not clear from the record whether this is accurate; Dr. Altmansberger's notes indicate "Consultative Exam Done" and "Eye Contact Appropriate," among other things (Tr. 359). These types of impressions indicate that Dr. Altmansberger met with plaintiff.

(Tr. 359).  Based on his findings, Dr. Altmansberger concluded
that plaintiff "retains the ability to understand, carry out and
remember simple instructions and [to] maintain concentration and
attention for extended periods" (Tr. 359).  Dr. Altmansberger
further concluded that plaintiff could "use appropriate judgment
to make simple work related decisions and can respond appropri-
ately to supervision, coworkers and work situations, [and]
therefore, []he can do simple work" (Tr. 359).

     d.  Dr. Edward Fruitman

     On July 30, 2012, psychiatrist Dr. Edward Fruitman
performed an initial psychiatric evaluation of plaintiff and
diagnosed him with major depression and panic disorder (Tr. 520).

     A subsequent treatment note by Dr. Fruitman, dated
August 31, 2012, diagnosed plaintiff with anxiety and depression
(Tr. 532).  Dr. Fruitman increased plaintiff's dosages of
Zyprexa, Prozac and Xanax (Tr. 532).

     In October 2012, Dr. Fruitman observed that plaintiff
had no mood instability at that time and that his anxiety was
well controlled (Tr. 531).  Dr. Fruitman again increased plain-
tiff's dosage of Zyprexa (Tr. 531).

13

In a January 10, 2013 treatment note, Dr. Fruitman noted that plaintiff had no symptoms of anxiety, his mood was stable but that he still had issues with sleeping (Tr. 528).

A March 22, 2013 treatment note from Dr. Fruitman noted that plaintiff's mood was sad, but that plaintiff was hopeful (Tr. 519).  Plaintiff reported that Zyprexa was helping him (Tr. 519).

On April 24, 2013, Dr. Fruitman observed that plaintiff's mood was calm, but that his sleep was still fragmented (Tr. 527).  He noted that plaintiff's mother had died in December 2012 and that plaintiff was grieving (Tr. 527).  Plaintiff reported that Xanax was helping him but caused nausea (Tr. 527).

In May 2013, Dr. Fruitman met with plaintiff and completed a "Medical Source Statement About What the Claimant Can Still Do Despite Mental Impairments" (hereinafter "May 2013 Mental Impairment Assessment") (Tr. 410-14).  Dr. Fruitman noted that plaintiff suffered from depression, anxiety, panic attacks and a life-threatening illness, had a current GAF score of 50 and a GAF score of 55 in the past (Tr. 410).  Dr. Fruitman noted that plaintiff was taking Xanax, Prozac and Zyprexa and that the side effects of these medications were dizziness and drowsiness (Tr. 411).  Dr. Fruitman also concluded that plaintiff had marked limitations in the activities of daily living and difficulties in

14

maintaining social functioning, as well as frequent deficiencies of concentration and repeated episodes of deterioration or decompensation in work or work-like settings (Tr. 413-14). Dr. Fruitman stated that plaintiff uses public transportation and could get along with coworkers and peers without unduly distracting them or exhibiting behavioral extremes (Tr. 413). Dr. Fruitman's treatment note from this same date noted that plaintiff was depressed, afraid and crying and that plaintiff would be returning to the hospital in one week due to his cancer (Tr. 526). Dr. Fruitman also increased plaintiff's dosage of Xanax (Tr. 526).

A June 19, 2013 treatment note from Dr. Fruitman reported that plaintiff was "less anxious, [and] more hopeful and optimistic about his cancer" (Tr. 525). Dr. Fruitman also noted that plaintiff reported adequate sleep, his mood was calm and was "doing well for now" (Tr. 525).

In a treatment noted dated August 15, 2013, Dr. Fruitman noted that plaintiff's mood was stable (Tr. 523). A September 11, 2013 treatment note from Dr. Fruitman indicates that plaintiff was doing well, with less anxiety and improved mood and sleep (Tr. 522).

e.  <u>FEGS Evaluation</u>

In March 2013, representative from the Federation Employment & Guidance Service (FEGS), completed a function report, bio-psychosocial summary and medical report for plaintiff (Tr. 202-09, 362-98).  A FEGS social worker offered the following evaluation:

> Client is a 38 year old Hispanic male who reports current mental health treatment.  Client denies any current suicidal/homicidal ideation plan or intent. Client reports feeling down and depressed due to his current situation regarding medical health condition, living conditions and family issues.  Client reports difficulty sleeping due to body pain, feeling tired with little energy, low self-esteem.  Client scored 13 on the PHQ-9 scale.[9]

(Tr. 371).  FEGS also noted that plaintiff reported that he could not take public transportation because he walks with a wheelchair and walker (Tr. 372-73, 384).

---

[9]The PHQ-9 is a questionnaire used to assess the severity of a patient's depression.  A score of 15 to 19 indicates moderately severe depression; a score of 10 to 14 indicates moderate depression; and a score of 5 to 9 indicates mild depression.  <u>See</u> <u>PHQ-9 Questionnaire for Depression Scoring and Interpretation</u>, University of Michigan, <u>available</u> <u>at</u> http://www.med.umich.edu/1info/-FHP/practiceguides/depress/score.pdf (last visited Sept. 28, 2016).

D.   <u>Proceedings Before the ALJ</u>

1.   <u>Plaintiff's Testimony</u>

Plaintiff testified at the October 2013 hearing that he has been disabled since 2011 when he was diagnosed with lymphoma but that his cancer was in remission (Tr. 30-32).  He was hospitalized on and off during a nine-month period (Tr. 30).  Plaintiff testified that he fell several times and that in 2012 he was prescribed a stroller because he could not steady himself (Tr. 30-31).  Plaintiff testified that as a result of his chemotherapy, he could not walk, stand or sit for long periods and that he experiences throbbing in his back and legs (Tr. 32).  He stated that he could only stand or sit for 15 minutes at a time and lift five pounds (Tr. 32, 42).

Plaintiff testified that he signed himself out of the hospital at some point because he needed to be with his son and his mother who was dying (Tr. 34).  Plaintiff also testified that he missed a lot of appointments because his wife was unable to take him (Tr. 34, 43).  Plaintiff testified that August 2013 was the last time that he was treated at Memorial Sloan-Kettering Cancer Center (Tr. 45).

Plaintiff also testified that he was continuing to receive psychiatric care as of the date of the hearing (Tr. 30).

17

He stated that he was prescribed Prozac, which makes him "woozy," and that, as a result of his medication regimen, he is constantly shaking, forgetful and drowsy (Tr. 33-34, 39-40). Plaintiff further testified that Xanax makes him feel "like a zombie" (Tr. 39-40). Plaintiff also reported that because of his conditions, his wife does all the household chores and takes him where he needs to go (Tr. 40-41).

    2. <u>Vocational Expert Testimony</u>

    Vocational expert Ms. Pasquale testified at the hearing (Tr. 49-53). The ALJ posed the following hypothetical to the expert and asked what kind of work this hypothetical individual could perform in the national economy:

> Please consider a hypothetical individual of the claim-
> ant's age, education, work experience, and the residual
> functional capacity to lift and/or carry up to 20
> pounds occasionally, 10 pounds frequently. Stand
> and/or walk with normal breaks for a total of about six
> hours in an eight-hour workday. Sit with normal breaks
> for a total of about six hours in an eight-hour work-
> day. Occasional climbing of ramps and stairs, no
> ladders, ropes or scaffolds.
>
> Occasional balance and stooping, kneeling, crouching
> and crawling. Includes a sit/stand option with the
> ability to alternate positions every 30 minutes. Avoid
> concentrated exposure to odors, dusts, fumes, gasses,
> poor ventilation and other respiratory irritants. That
> further takes into account -- exertional limitations
> around the performance of simple, routine and repeti-
> tive tasks, that can be explained; which involves

making simple decisions.  Occasional changes in routine.
(Tr. 50).  Pasquale stated that such a person could work as a
clerk, marker, or janitor, as defined in the Dictionary of
Occupational Titles ("DOT"), all of which were jobs requiring
light, unskilled labor (Tr. 50-51).  The ALJ then asked the
expert about a second hypothetical in which all of the limita-
tions from the first hypothetical were present, except that
instead of a functional range of light work, she should instead
consider a functional range of sedentary work (Tr. 51-52).  In
response to the second hypothetical, Pasquale identified jobs in
the DOT defined as addresser, surveillance-system monitor and
bench hand, all of which are sedentary, unskilled work (Tr. 551-
52).

III.  <u>Analysis</u>

   A.  Applicable Legal
       <u>Principles</u>

      1.  <u>Standard of Review</u>

      The Court may set aside the final decision of the
Commissioner only if it is not supported by substantial evidence
or if it is based upon an erroneous legal standard.  42 U.S.C.
§ 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per</u>

curiam); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012);

<u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008).  Moreover,

the court cannot "affirm an administrative action on grounds

different from those considered by the agency." <u>Lesterhuis v.</u>

<u>Colvin</u>, 805 F.3d 83, 87 (2d Cir. 2015), <u>quoting</u> <u>Burgess v.</u>

<u>Astrue</u>, 537 F.3d 117, 128 (2d Cir. 2008).

   The Court first reviews the Commissioner's decision for

compliance with the correct legal standards; only then does it

determine whether the Commissioner's conclusions were supported

by substantial evidence.  <u>Byam v. Barnhart</u>, 336 F.3d 172, 179 (2d

Cir. 2003), <u>citing</u> <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir.

1999).  "Even if the Commissioner's decision is supported by

substantial evidence, legal error alone can be enough to overturn

the ALJ's decision," <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322,

328 (S.D.N.Y. 2009) (Marrero, D.J.).  However, "where application

of the correct legal principles to the record could lead to only

one conclusion, there is no need to require agency reconsidera-

tion." <u>Johnson v. Bowen</u>, 817 F.2d 983, 986 (2d Cir. 1987).

   "'Substantial evidence' is 'more than a mere scintilla.

It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion.'" <u>Talavera v. Astrue</u>,

<u>supra</u>, 697 F.3d at 151, <u>quoting</u> <u>Richardson v. Perales</u>, 402 U.S.

389, 401 (1971).  Consequently, "[e]ven where the administrative

record may also adequately support contrary findings on particu-
lar issues, the ALJ's factual findings 'must be given conclusive
effect' so long as they are supported by substantial evidence."
Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam),
quoting Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982).
Thus, "[i]n determining whether the agency's findings were
supported by substantial evidence, 'the reviewing court is
required to examine the entire record, including contradictory
evidence and evidence from which conflicting inferences can be
drawn.'"  Selian v. Astrue, supra, 708 F.3d at 417 (citation
omitted).

> 2.  Determination
>     of Disability

A claimant is entitled to SSI if the claimant can
establish an "inability to engage in any substantial gainful
activity by reason of any medically determinable physical or
mental impairment . . . which has lasted or can be expected to
last for a continuous period of not less than twelve months."[10]

---

[10] The standards that must be met to receive SSI benefits
under Title XVI of the Act are the same as the standards that
must be met in order to receive DIB under Title II of the Act.
Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases
addressing the former are equally applicable to cases involving
the latter.

42 U.S.C. § 1382c(a)(3)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both the impairment and the inability to work must last twelve months).

The impairment must be demonstrated by "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 1382c(a)(3)(D), and it must be "of such severity" that the claimant cannot perform his previous work and "cannot, considering [his] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). Whether such work is actually available in the area where the claimant resides is immaterial. 42 U.S.C. § 1382c(a)(3)(B).

In making the disability determination, the Commissioner must consider: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999), quoting Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (internal quotation marks omitted).

In determining whether an individual is disabled, the Commissioner must follow the five-step process required by the regulations. 20 C.F.R. § 416.920(a)(4)(i)(v); see Selian v.

22

Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697
F.3d at 151.  The first step is a determination of whether the
claimant is engaged in substantial gainful activity.  20 C.F.R. §
416.920(a)(4)(i).  If he is not, the second step requires deter-
mining whether the claimant has a "severe medically determinable
physical or mental impairment."  20 C.F.R. § 416.920(a)(4)(ii).
If he does, the inquiry at the third step is whether any of these
impairments meet one of the listings in Appendix 1 of the regula-
tions.  20 C.F.R. § 416.920(a)(4)(iii).  To be found disabled
based on a listing, the claimant's medically determinable impair-
ment must satisfy all of the criteria of the relevant listing.
20 C.F.R. § 416.925(c)(3); Sullivan v. Zebley, 493 U.S. 521, 530
(1990); Otts v. Comm'r of Soc. Sec., 249 F. App'x 887, 888 (2d
Cir. 2007) (summary order).  If the claimant meets a listing, the
claimant is disabled.  20 C.F.R. § 416.920(a)(4)(iii).

     If the claimant does not meet any of the listings in
Appendix 1, step four requires an assessment of the claimant's
residual functional capacity ("RFC") and whether the claimant can
still perform his past relevant work given his RFC.  20 C.F.R. §
416.920(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at 24-
25.  If he cannot, then the fifth step requires assessment of
whether, given claimant's RFC, he can make an adjustment to other

23

work.  20 C.F.R. § 416.920(a)(4)(v).  If he cannot, he will be found disabled.  20 C.F.R. § 416.920(a)(4)(v).

RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a)(1).  To determine RFC, the ALJ "identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b),(c), and (d) of 20 [C.F.R. §§] 404.1545 and 416.945." Cichocki v. Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *1 (July 2, 1996).  The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work which may be categorized as sedentary, light, medium, heavy or very heavy.[11]  20 C.F.R. § 416.967; see Schaal v. Apfel, 134 F.3d 496, 501 n.6 (2d Cir. 1998).  This ability may then be found to be limited further by nonexertional factors that restrict claimant's ability to work.[12]  See Michaels

---

[11]Exertional limitations are those which "affect [plaintiff's] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)."  20 C.F.R. § 416.969a(b).

[12]Nonexertional limitations are those which "affect only [plaintiff's] ability to meet the demands of jobs other than the strength demands," including difficulty functioning because of
                                                    (continued...)

v. Colvin, 621 F. App'x 35, 38 n.4 (2d Cir. 2015) (summary order); Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010).  The RFC assessment "must be based on all of the relevant evidence in the case record," including "the effects of treatment . . . limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption to routine, side effects of medication)."  SSR 96-8p, supra, 1996 WL 374184 at *5 (emphasis in original); see also 20 C.F.R. § 416.929(c)(3)(iv).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than his past work.  Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128; Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005).

---

[12](...continued)
nervousness, anxiety or depression, maintaining attention or concentration, understanding or remembering detailed instructions, seeing or hearing, tolerating dust or fumes, or manipulative or postural functions, such as reaching, handling, stooping, climbing, crawling or crouching.  20 C.F.R. § 416.969a(c).

In some cases, the Commissioner can rely exclusively on the medical-vocational guidelines (the "Grids") contained in C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step.  Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995).  "The Grid[s] take[] into account the claimant's RFC in conjunction with the claimant's age, education and work experience.  Based on these factors, the Grid[s] indicate[] whether the claimant can engage in any other substantial gainful work which exists in the national economy."  Gray v. Chater, supra, 903 F. Supp. at 298; see Butts v. Barnhart, supra, 388 F.3d at 383.

Exclusive reliance on the Grids is not appropriate where nonexertional limitations "significantly diminish [a claimant's] ability to work."  Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986); accord Butts v. Barnhart, supra, 388 F.3d at 383.  "Significantly diminish" means "the additional loss of work capacity beyond a negligible one or, in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity."  Bapp v. Bowen, supra, 802 F.2d at 606; accord Selian v. Astrue, supra, 708 F.3d at 421; Zabala v. Astrue, supra, 595 F.3d at 411.  When the ALJ finds that the nonexertional limitations significantly diminish a claimant's ability to work, then the Commissioner must introduce

26

the testimony of a vocational expert or other similar evidence in order to prove "that jobs exist in the economy which the claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 383-84 (internal quotation marks and citation omitted); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").  An ALJ may rely on a vocational expert's testimony presented in response to a hypothetical if there is "substantial record evidence to support the assumption[s] upon which the vocational expert based his opinion." Dumas v. Schweiker, 712 F.2d 1545, 1554 (2d Cir. 1983); accord Rivera v. Colvin, 11 Civ. 7469, 2014 WL 3732317 at *40 (S.D.N.Y. July 28, 2014) (Swain, D.J.) ("Provided that the characteristics described in the hypothetical question accurately reflect the limitations and capabilities of the claimant and are based on substantial evidence in the record, the ALJ may then rely on the vocational expert's testimony regarding jobs that could be performed by a person with those characteristics.").

3.  Treating Physician Rule

In considering the evidence in the record, the ALJ must give deference to the opinions of a claimant's treating physi-

27

cians.  A treating physician's opinion will be given controlling
weight if it is "well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in . . . [the] record."  20 C.F.R.
§ 416.927(c)(2); see also Shaw v. Chater, 221 F.3d 126, 134 (2d
Cir. 2000); Diaz v. Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995);
Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).

      "[G]ood reasons" must be given for declining to afford
a treating physician's opinion controlling weight.  20 C.F.R. §
416.927(c)(2); Schisler v. Sullivan, supra, 3 F.3d at 568; Burris
v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *4 n.3 (S.D.N.Y.
Apr. 2, 1996) (Stein, D.J.).  The Second Circuit has noted that
it "'do[es] not hesitate to remand when the Commissioner has not
provided "good reasons" for the weight given to a treating
physician[']s opinion.'"  Morgan v. Colvin, 592 F. App'x 49, 50
(2d Cir. 2015) (summary order), quoting Halloran v. Barnhart, 362
F.3d 28, 33 (2d Cir. 2004); accord Greek v. Colvin, 802 F.3d 370,
375 (2d Cir. 2015).  Before an ALJ can give a treating physi-
cian's opinion less than controlling weight, the ALJ must con-
sider various factors to determine the amount of weight the
opinion should be given.  These factors include:  (1) the length
of the treatment relationship and the frequency of examination,
(2) the nature and extent of the treatment relationship, (3) the

medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) the physician's level of specialization in the area and (6) other factors that tend to support or contradict the opinion.   20 C.F.R. § 416.927(c)(2)-(6); Schisler v. Sullivan, supra, 3 F.3d at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at *16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.); Matovic v. Chater, 94 Civ. 2296 (LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan. 12, 1996) (McKenna, D.J.).   Although the foregoing factors guide an ALJ's assessment of a treating physician's opinion, the ALJ need not expressly address each factor.   Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) ("We require no such slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear.").

As long as the ALJ provides "good reasons" for the weight accorded to the treating physician's opinion and the ALJ's reasoning is supported by substantial evidence, remand is unwarranted.   See Halloran v. Barnhart, supra, 362 F.3d at 32-33; see also Atwater v. Astrue, supra, 512 F. App'x at 70; Petrie v. Astrue, 412 F. App'x 401, 406-07 (2d Cir. 2011) (summary order); Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009) (summary order).   The ALJ is responsible for determining whether a claimant is "disabled" under the Act and need not credit a physician's

determination to this effect where it is contradicted by the medical record.  See Wells v. Comm'r of Soc. Sec., 338 F. App'x 64, 66 (2d Cir. 2009) (summary order).  The ALJ may rely on a consultative opinion where it is supported by substantial evidence in the record.  See Richardson v. Perales, supra, 402 U.S. at 410; Camille v. Colvin, -- F. App'x --, No. 15-2087, 2016 WL 3391243 at *1 (2d Cir. June 15, 2016) (summary order); Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995); Mongeur v. Heckler, supra, 722 F.2d at 1039.

### 4.  Credibility

In determining a claimant's RFC, the ALJ is required to consider the claimant's reports of pain and other limitations, 20 C.F.R. § 416.929, but is not required to accept the claimant's subjective complaints without question.  McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980). "It is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."  Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983); see also Mimms v. Heckler, 750 F.2d 180, 185-86 (2d Cir. 1984); Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591-92 (2d Cir. 1984).  The ALJ has discretion to weigh the

credibility of the claimant's testimony in light of the medical findings and other evidence in the record.  Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

The regulations provide a two-step process for evaluating a claimant's subjective assertions of disability.

> At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  20 C.F.R. § 404.1529(b).  That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability.  20 C.F.R. § 404.1529(a).  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record.  Id.  The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."  20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

Genier v. Astrue, supra, 606 F.3d at 49 (alterations and emphasis in original); see also 20 C.F.R. § 416.929(a); 20 C.F.R. § 416.927; Snyder v. Colvin, -- F. App'x --, 15-3502, 2016 WL 3570107 at *2 (2d Cir. June 30, 2016) (summary order), citing SSR 16-3P, 2016 WL 1119029 (Mar. 16, 2016).[13]  The ALJ must explain

---

[13]SSR 16-3p supersedes SSR 96-7p, 1996 WL 374186 (July 2,
(continued...)

his decision to reject a claimant's testimony "'with sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief' and whether his decision is supported by substantial evidence." Calzada v. Astrue, 753 F. Supp. 2d 250, 280 (S.D.N.Y. 2010) (Sullivan, D.J.) (alteration in original), quoting Fox v. Astrue, 05 Civ. 1599 (NAM)(DRH), 2008 WL 828078 at *12 (N.D.N.Y. Mar. 26, 2008); see also Lugo v. Apfel, 20 F. Supp. 2d 662, 664 (S.D.N.Y. 1998) (Rakoff, D.J.).  The ALJ's determination of credibility is entitled to deference.  See Snell v. Apfel, 177 F.3d 128, 135-36 (2d Cir. 1999) ("After all, the ALJ is in a better position to decide issues of credibility"); Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995) (Leisure, D.J.) ("Deference should be accorded the ALJ's determination because he heard Plaintiff's testimony and observed his demeanor.").

---

[13](...continued)
1996), and clarifies the policies set forth in the previous SSR. See SSR 16-3P, supra, 2016 WL 1237954.  Plaintiff's brief, submitted before SSR 16-3p was issued, cites to the principle in SSR 96-7p that the ALJ should consider the side effects of a claimant's medications (Pl. Mem. at 10).  This same principle is found in SSR 16-3p, supra, 2016 WL 1119029 at *7, and as discussed below, is considered in this opinion.

B.   The ALJ's
     Decision

The ALJ applied the five-step analysis described above
and determined that plaintiff was not disabled (Tr. 12-22).
Although plaintiff's alleged onset date was October 2011, because
SSI is not payable prior to the month following the month in
which the application was filed, the ALJ considered whether
plaintiff had been under a disability under the SSA since his
application date of February 21, 2012 (Tr. 12).  In doing so, he
considered plaintiff's complete medical history (Tr. 12).

At step one, the ALJ found that plaintiff had not
engaged in substantial gainful activity since February 2012 (Tr.
14).

At step two, the ALJ found that plaintiff suffered from
the following severe impairments:  Hodgkin's lymphoma (in remis-
sion), asthma, lumbar disorder, depression, panic disorder,
opioid dependence and benzodiazepine abuse, in remission (Tr.
14).  The ALJ observed that plaintiff had other impairments,
including deep vein thrombosis and hypertension, but concluded
that these impairments were not severe (Tr. 14).  The ALJ also
noted that plaintiff had "problems with his lower extremities due
to cysts or rashes" but that these conditions had been treated

33

"with no significant findings" and were non-severe impairments that had lasted less than 12 months (Tr. 14).

At step three, the ALJ concluded that plaintiff's alleged impairments, either singly or in combination, were not medically equal to the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (Tr. 14-16).  Specifically, he found that plaintiff did not meet Section 1.04 (Disorders of the Spine), Section 3.03 (Asthma), Section 12.04 (Affective Disorders), Section 12.06 (Anxiety-related Disorders), Section 12.09, Substance addiction disorders or Section 13.05 (Lymphoma) (Tr. 14-15).

The ALJ found that "[n]o treating or examining physician has mentioned findings that are the same or equivalent in severity to the criteria of any listed impairment, nor does the evidence show signs or findings that are the same or equivalent to those of any listed impairment" (Tr. 15).  In evaluating whether plaintiff's mental impairments met a listing, the ALJ considered the "paragraph B" criteria in Listings 12.04 and 12.09[14] with regard to plaintiff's limitation on the activities

---

[14]To satisfy the "paragraph B" criteria for either of these listings, the mental impairment must result in at least two of the following:  (1) marked restriction of activities of daily living; (2) marked difficulties maintaining social functioning; (3) marked difficulties in maintaining concentration,
(continued...)

34

of daily living (Tr. 15).  The ALJ determined that plaintiff had mild restrictions in his activities of daily living, mild difficulties in social functioning, moderate difficulties with regard to concentration, persistence or pace, and had no episodes of decompensation (Tr. 15).  Accordingly, the ALJ concluded that because plaintiff's "mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the 'paragraph B' criteria [were] not satisfied" (Tr. 15).  The ALJ also found that plaintiff did not meet the 'paragraph C' criteria[15] for these listings (Tr. 16).

The ALJ then determined that plaintiff retained the RFC[16] to perform "sedentary work" except that plaintiff

[14](...continued)
persistence, or pace; (4) repeated episodes of decompensation, each of extended duration.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 ¶ B, § 12.09 ¶ B.

[15]The paragraph "C" criteria are satisfied by a medically documented chronic affective disorder that has lasted at least two years, with at least one of the following:  (1) repeated episodes of decompensation, each of extended duration; (2) a residual disease process that resulted in such a marginal adjustment that even a minimal increase in mental demands of change in the environment would be predicted to cause the individual to decompensate; (3) a current history of one or more years' inability to function outside a highly supportive living environment.  See 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 ¶ C, § 12.09 ¶ B.

[16] As discussed above, RFC is defined as "the most [the
(continued...)

35

can lift and or carry up to 10 pounds occasionally and
up to 10 pounds frequently; stand and or walk for about
6 hours per 8-hour workday with normal breaks; and sit
for about 6 hours per 8-hour workday with normal
breaks.  [Plaintiff] can occasionally climb ramps or
stairs; never climb ladders, ropes, or scaffolds; and
occasionally balance, stoop, kneel, crouch, or crawl.
[Plaintiff] must be allowed a sit-stand option with the
option to rotate position every 30 minutes.  [Plain-
tiff] must avoid concentrated exposure to odors, dusts,
gases, poor ventilation, and other respiratory irri-
tants.  [Plaintiff's] work must take into account
non-exertional limitations allowing the performance of
simple, routine, and repetitive tasks that [can] be
explained, which involves making simple decisions and
only occasional changes in routine.

(Tr. 16).  The ALJ specified that plaintiff was "limited to

sedentary work with postural limitations with the ability to

change position once every 30 minutes" to account for plaintiff's

Hodgkin's lymphoma and his lumbar disorder (Tr. 20).  The ALJ

also noted that plaintiff has "environmental limitations" to

account for his asthma (Tr. 20).  Finally, plaintiff was "limited

---

[16](...continued)
claimant] can still do despite [his] limitations."  20 C.F.R. §
416.945(a)(1).

Sedentary work involves lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles
like docket files, ledgers, and small tools.  Although
a sedentary job is defined as one which involves sit-
ting, a certain amount of walking and standing is often
necessary in carrying out job duties.  Jobs are seden-
tary if walking and standing are required occasionally
and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

to simple work with only occasional changes in routine and simple decision-making" due to plaintiff's alleged depression and anxiety (Tr. 20).

In coming to these conclusions, the ALJ considered plaintiff's testimony and assessed plaintiff's credibility.  The ALJ found that although plaintiff's medically determinable impairments could reasonably be expected to cause his claimed symptoms, his allegations regarding the intensity, persistence and limiting effects of the symptoms were unsupported by or contradicted by the medical record (Tr. 17, 19-20).  For example, the ALJ noted that plaintiff "reported ambulating with assis-tance, but overall his standing balance was consistently fair with a good sitting balance demonstrating that he can do seden-tary work with a sit-stand option" (Tr. 20).

To reach the RFC determination, the ALJ also considered plaintiff's medical records and summarized plaintiff's medical history and the opinions of his treating physicians as well as the consultative evaluations (Tr. 17-19).  The ALJ assessed the physician's opinions as follows: (a) "Dr. Fruitman's assessments [in a May 2013 mental assessment] are given little weight as they are not supported by [plaintiff's] treatment records in which he had generally normal mental status examinations with overall controlled mood and no active anxiety symptoms" (Tr. 19); (b)

37

"Dr. Seok's assessment [that plaintiff could do light work] is given little weight as it was rendered before the completion of the medical evidence of record, in which [plaintiff] reported low back pain and problems staying in one position" (Tr. 18); (c) "Dr. Bougakov's assessments are given considerable weight given [plaintiff's] overall normal mental status examination with slight problems with his remote memory" (Tr. 19); and (d) "Dr. Altmansberger's assessments are given significant weight given his expertise and the fact that [plaintiff's] mental status examinations were generally normal with intact attention and concentration" (Tr. 19).

At step four, the ALJ concluded that plaintiff was unable to perform the duties of his past work because they were too demanding (Tr. 20).

At step five, relying on the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that plaintiff could perform, given his RFC, age and education (Tr. 21-22). The ALJ thus concluded that plaintiff was not disabled (Tr. 21-22).

C.   Analysis of the
     ALJ's Decision

          Plaintiff contends that the ALJ's decision should be
overturned for the following reasons:  (1) the ALJ's mental RFC
assessment was flawed because he failed to consider properly the
treating physician rule in deciding not to give controlling
weight to Dr. Fruitman's May 2013 mental assessment and (2) the
ALJ's physical RFC assessment was erroneous because the ALJ
failed to consider plaintiff's use of a hand-held assistive
device and the side effects of plaintiff's medications (see Pl.
Mem.).  The Commissioner contends that the ALJ's decision was
supported by substantial evidence and should be affirmed (Memo-
randum of Law in Opposition to Plaintiff's Motion for Judgment on
the Pleadings, dated January 15, 2016, (D.I. 21) ("Comm'r Mem.").

          1.   Mental RFC Assessment
               and Application of the
               Treating Physician Rule

          Plaintiff first argues that the ALJ failed to evaluate
treating psychiatrist Dr. Fruitman's opinion properly by afford-
ing his opinion "little" rather than "controlling" weight and by
affording "considerable" and "significant" weight to the opinions
of non-treating psychiatrists Dr. Bougakov and Dr. Altmansberger
respectively.  Plaintiff argues that contrary to the ALJ's

conclusions, Dr. Fruitman's May 2013 Mental Impairment Assessment was supported by Dr. Fruitman's treatment notes and that Dr. Fruitman was in a better position to provide an overall assessment of plaintiff's functioning (Pl. Mem. at 1-7). The Commissioner argues that the ALJ correctly found that Dr. Fruitman's May 2013 Mental Impairment Assessment was contradicted by his own treatment notes and that to the extent the assessment was accurate, it reflected only plaintiff's experience of an unusual increase in stress limited to a particular date (Comm'r Mem. at 18-21).

Although the ALJ did not explicitly go through the six-step framework for evaluating a treating physician's opinion, the ALJ provided good reasons for affording "little weight" to Dr. Fruitman's opinion, namely that it was unsupported by Dr. Fruitman's own treatment notes, which showed that plaintiff had overall normal mental status examinations and there was general improvement in plaintiff's mood and anxiety over the course of treatment. Although plaintiff argues that the "longitudinal relationship" between Dr. Fruitman and plaintiff puts him in the best position have a "rich and nuanced understanding" of plaintiff's mental health, Dr. Fruitman's May 2013 Mental Impairment Assessment is more reflective of plaintiff's condition on that date rather than over the course of his treatment.

40

In Dr. Fruitman's May 2013 Mental Impairment Assessment
he concluded that plaintiff could not even perform simple work.
In that assessment, Dr. Fruitman diagnosed plaintiff with depres-
sion, panic attacks, anxiety and noted that he had "active non-
Hodgkins lymphoma" (Tr. 410).  Dr. Fruitman indicated that
plaintiff's symptoms included "personality change," "delusions or
hallucinations," "oddities of thought, perception, speech or
behavior," "time or place disorientation," "Illogical thinking or
loosening of associations" and "Hostility and irritability" (Tr.
410).  In a note above his assessments of plaintiff's capabili-
ties to perform certain mental impairments on a regular and
continuing basis, Dr. Fruitman noted that "[patient] is soon to
be hospitalized 1 week [sic] of June for chemotherapy.  Diagnosed
with lymphoma.  Now will be hospitalized based on Pet Scan!" (Tr.
411).  Dr. Fruitman wrote "N/A" on a section of the form that
asked how often plaintiff's impairments would cause him to be
absent from work (Tr. 411).  Among other things, Dr. Fruitman
opined that plaintiff would have "Marked Loss" in his ability to
remember locations and work-like procedures and understand and
remember very short, simple instructions (Tr. 412).  He indi-
cated, however, that plaintiff had "No/Mild Loss" in his ability
to carry out very short simple instructions, understand and
remember detailed instructions and carry out detailed instruc-

41

tions (Tr. 412).  He stated that plaintiff had "Extreme Loss" in
the ability to maintain attention and concentration for extended
periods of two hours or longer and make simple work decisions
(Tr. 412).  Dr. Fruitman left blank the section of the form that
requested that the doctor identify when the condition began and
for how long it would persist (Tr. 414).  In Dr. Fruitman's
treatment notes from the same date, he indicated that plaintiff
was "afraid, crying," was going to be hospitalized in one week
and had panic attacks (Tr. 526).  Dr. Fruitman increased plain-
tiff's prescription for Xanax "for now" because "[plaintiff]
stated, it helps" (Tr. 526).

        However, as the ALJ correctly found, the remaining
treatment notes did not indicate that plaintiff continually
experienced the symptoms in the May 2013 Mental Impairment
Assessment and instead reflect "generally normal mental status
examinations with overall controlled mood and no active anxiety
symptoms" (Tr. 19).  Although Dr. Fruitman initially diagnosed
plaintiff with "Major Depression" and "Anxiety Disorder" in July
2012 (Tr. 520) and plaintiff was diagnosed as having a "sad" mood
in March 2013 (Tr. 519), the remaining treatment notes through
September 2013 showed that plaintiff's mood and anxiety symptoms
improved with medication, treatment and improvements in his
cancer diagnosis.  Plaintiff had "no mood instability" with

anxiety in good control in October 2012 (Tr. 531).  Plaintiff's
sleep was an issue but he had no symptoms of anxiety and a stable
mood in January 2013 (Tr. 528).  Plaintiff's sleep was "frag-
mented" but he was optimistic and his mood was "calm" in April
2013 (Tr. 527).  Plaintiff was "less anxious, more hopeful and
optimistic about his cancer" and his mood was "calm" in June 2013
(Tr. 525).  Plaintiff's mood was "stable" in August 2013 (Tr.
523) and plaintiff was "doing well" and had "improved mood,
sleep" in September 2013 (Tr. 522).  The treatment notes do not
reflect that plaintiff had "time or place disorientation,"
"[i]llogical thinking or behavior" or "extreme loss" in concen-
tration -- symptoms which were all included Dr. Fruitman's May
2013 Mental Impairment Assessment (Tr. 410).  Finally, although
Dr. Fruitman did not expressly indicate that he was opining on
plaintiff's mental state on a particular date in the May 2013
Mental Impairment Assessment (Tr. 414), when read in context,
there is a strong indication that that assessment reflected
plaintiff's condition on that date rather than a longer period of
time.  Thus, although plaintiff did experience low points in his
mental health history including during the period prior to his
hospitalization in May 2013, the medical record demonstrates that
plaintiff did not continually experience the marked symptoms or
instability Dr. Fruitman reported in his May 2013 psychological

assessment that would prevent plaintiff from doing even simple work.

Plaintiff also argues that the ALJ erred in relying on the assessments made by the consulting doctors because their opinions were rendered in April and May 2012 before the development of much of the medical record and because Dr. Altmansberger never examined plaintiff.  Plaintiff is correct that, generally, opinions from consultative physicians are not entitled to significant weight, in particular where the physicians do not have the benefit of the complete medical record.  See Selian v. Astrue, supra, 708 F.3d at 419 ("We have previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination.") (citation omitted); Tarsia v. Astrue, 418 F. App'x 16, 18 (2d Cir. 2011) (summary order) ("Because it is unclear whether [the consulting physician] reviewed all of [plaintiff's] relevant medical information, his opinion is not 'supported by evidence of record' as required to override the opinion of [the] treating physician"); Gunter v. Commissioner of Social Security, 361 F. App'x 197, 200 (2d Cir. 2010) (summary order) ("The record also reveals that Dr. Wells, a non-examining physician, made his assessment without reviewing the complete record of [plaintiff's] medical history, which revealed medial meniscus tears in both of [plaintiff's] knees.

44

Consideration of [plaintiff's] entire medical records might have altered Dr. Wells's conclusions."); but see Camille v. Colvin, supra, 2016 WL 3391243 at *3 n.4 ("No case or regulation [plaintiff] cites imposes an unqualified rule that a medical opinion is superseded by additional material in the record, and in this case the additional evidence does not raise doubts as to the reliability of [the consulting doctor's] opinion.").

Here, however, the ALJ did not rely on the opinions of the non-treating examiners in a vacuum, and plaintiff has not identified any evidence that should have altered the consulting examiner's conclusions.  Rather, the ALJ found that the assessments made by the consulting psychologists that plaintiff could do simple work with simple decision-making and occasional changes in routine were consistent with Dr. Fruitman's treatment notes from 2012 to 2013, as described above (Tr. 19).  Further, the ALJ also cited to the treatment notes from Dr. Sardar, plaintiff's pain management doctor (Tr. 19, citing Ex. 19F), who, from June 2012 to February 2013, consistently noted that plaintiff was "MILDLY depressed with blunted affect [sic] however no signs of anxiety noted" and indicated that plaintiff was "pleasant and in no apparent distress.  Good eye contact . . . Patient appears to have good judgment, insight and memory" (Tr. 533-51 (emphasis in original)).  In March and April 2013, Dr. Sardar's notes also

45

indicated that plaintiff appeared "NORMAL and appropriate to situation, affect is bright and mood is congruent, no sign of depression or anxiety is noted" (Tr. 555-57 (emphasis in original)).  Further, the consultative doctors did not opine that plaintiff had no limitations -- rather, as the ALJ recognized and took into account, Dr. Bougakov noted that plaintiff had slight problems with remote memory and his anxiety that affected his ability to deal with stress and complex tasks and was limited to simple work (Tr. 19).  Similarly, the ALJ took into account Dr. Altmansberger's assessment that plaintiff had moderate restrictions in maintaining concentration, persistence or pace that would limit him to performing simple work (Tr. 19).  Thus, the ALJ's decision to rely more heavily on the opinions of these non-treating psychiatrists was not erroneous because their conclusions were supported by the medical record.  See Camille v. Colvin, supra, 2016 WL 3391243 at *2 & *3 n.4 (although there were additional treatment notes and assessments in the record that post-dated the consulting psychiatrist's opinion, "[s]ubstantial evidence support[ed] the limited weight that the ALJ attributed [to the treating physician's] opinions, because they were in conflict with content in that doctor's own clinical notes, and in conflict with the opinion of [the consulting psychiatrist]" (footnote omitted)); Wells v. Comm'r of Soc. Sec.,

46

supra, 338 F. App'x at 66 (affirming ALJ's decision not to give
controlling weight to treating physician's conclusion that
plaintiff was "disabled" where it was contradicted by substantial
evidence, including the treating physician's own evaluations of
plaintiff's medical condition).

Therefore, the ALJ's assessment of plaintiff's mental
RFC that plaintiff was "limited to simple work with only occa-
sional changes in routine and simple decision-making" (Tr. 20)
was supported by substantial evidence -- namely his treating
doctors' notes and the assessments by the consulting psycholo-
gists.

2.  Physical RFC Assessment

a.  Plaintiff's Use of
an Assistive Device for Walking

Plaintiff also argues that the ALJ erred when he failed
to consider plaintiff's use of a hand-held assistive device in
determining plaintiff's RFC and failed to ask the vocational
expert whether the jobs she considered could be done by an
individual who needed to use an assistive device to walk (Pl.
Mem. at 8-9).  The Commissioner argues that the ALJ explicitly
addressed plaintiff's use of an assistive device at the hearing
and in his decision and that the ALJ's RFC assessment incorpo-

rated the physical limitations plaintiff had that were supported by the evidence (Comm'r Mem. at 21-23).

Plaintiff's arguments are unavailing because there is no evidence in the record demonstrating that plaintiff's use of an assistive device was medically necessary, and in any event, the ALJ incorporated plaintiff's sitting and standing limitations in his assessment of plaintiff's ability to do sedentary work.

The ability to do sedentary work requires a person to be able to walk and stand "occasionally" meaning standing "from very little up to one-third of the time . . . generally [for a] total [of] no more than about 2 hours of an 8-hour workday" and sitting generally for a "total [of] about 6 hours of an 8-hour workday."  SSR 96-9p, 1996 WL 374185 at *3 (July 2, 1996).  Further, in this case, the ALJ's RFC assessment included a sit/stand option with the ability to alternate positions every 30 minutes (Tr. 16).  SSR 96-9p recognizes that the use of an assistive device may affect an individual's ability to do a full range of sedentary work and states that

> [t]o find that a hand-held assistive device is medi-
> cally required, there must be medical documentation
> establishing the need for a hand-held assistive device
> to aid in walking or standing, and describing the
> circumstances for which it is needed (i.e., whether all
> the time, periodically, or only in certain situations;
> distance and terrain; and any other relevant informa-
> tion). . . .

48

> Since most unskilled sedentary work requires only
> occasional lifting and carrying of light objects such
> as ledgers and files and a maximum lifting capacity for
> only 10 pounds, an individual who uses a medically
> required hand-held assistive device in one hand may
> still have the ability to perform the minimal lifting
> and carrying requirements of many sedentary unskilled
> occupations with the other hand. . . .  On the other
> hand, the occupational base for an individual who must
> use such a device for balance because of significant
> involvement of both lower extremities (e.g., because of
> a neurological impairment) may be significantly eroded.

SSR 96-9p, supra, 1996 WL 374185 at *7; see also Podolsky v.

Colvin, 12 Civ. 6544 (RA)(JLC), 2013 WL 5372536 at *15 (S.D.N.Y.

Sept. 26, 2013) (Cott, M.J.) ("SSR 96-9p provides that the use of

a medically-required hand-held assistive device, such as a cane,

may erode a claimant's sedentary occupational base.") (Report &

Recommendation) (emphasis in original), adopted at Podolsky v.

Colvin, 12 Civ. 6544 (RA)(JLC), 2014 U.S. Dist. LEXIS 45569

(S.D.N.Y. Mar. 31, 2014) (Abrams, D.J.).

The ALJ's failure to incorporate the use of an

assistive device in his hypothetical to the vocational expert was

not erroneous because, although there is evidence in the record

that plaintiff used assistive devices at times, there is no

medical documentation demonstrating that an assistive device was

necessary and if so, for what purpose.  During the hearing,

plaintiff testified that he could only walk with a

walker/stroller and his attorney argued that plaintiff was

limited in both legs in his ability to walk (Tr. 32-35).  In

49

February 2012, an SSA employee who interviewed plaintiff noted
that plaintiff walked with a cane (Tr. 167) and in April 2012,
Dr. Bougakov also noted that plaintiff walked with a cane (Tr.
340).  Although plaintiff testified that a doctor prescribed a
stroller for him in or around August 2012 (Tr. 37, 560-61), there
is no prescription in the record.  Further, from June through
October 2012, plaintiff's pain management doctor noted that
plaintiff walked independently and opined that an assistive
device was not necessary (Tr. 533-42 (noting that "[p]atient is
able to ambulate independently[.] HOWEVER with slow gait and mild
difficulty.  The patient also is unable to stand on toes and
heels.  Balance is good; however the patient does not require any
assistive devices for ambulation").  Although plaintiff's doctor
included notations in November 2012 and subsequent dates that
plaintiff walked "USING SAC" (Tr. 544-57), there is no clarifica-
tion as to whether "SAC" refers to a crutch, cane or stroller.[17]
Further, the doctor "noted" plaintiff's "difficulties in standing
and walking without assistive devices," but the doctor did not
opine that an assistive device was medically necessary (Tr. 544-
57).  Thus, because it was not supported by the substantial

---

[17]Neither party defines "SAC" in their papers.  It is possi-
ble that this refers to "standard axillary crutch."  See Product
Page for Medline Standard Aluminum Crutches, available at
http://www.medline.com/product/Standard-Aluminum-Crutches/Z05-PF0
4805 (last visited Sept. 28, 2016).

medical record, the ALJ's decision not to pose this limitation in
his hypothetical to the vocational expert was not erroneous.
See, e.g., Margotta v. Colvin, 13 Civ. 3219 (RWS), 2014 WL
2854623 at *13 (S.D.N.Y. June 23, 2014) (Sweet, D.J.) (ALJ is
"not required to incorporate restrictions into the RFC or pose a
hypothetical to [a vocational expert] that [is] not supported by
the record."); Podolsky v. Colvin, supra, 2013 WL 5372536 at *16
(claimant failed to make showing that assistive device was
medically necessary where claimant's doctors reported that
plaintiff used a cane but did not affirmatively opine that it was
medically necessary), citing Miller v. Astrue, 538 F. Supp. 2d
641, 651 n.4 (S.D.N.Y. 2008) (Conner, D.J.) (where there was no
evidence that plaintiff required a cane at all times and where
treating physicians did not opine that she was required to use
cane, plaintiff's use of cane did not factor into finding her
able to perform sedentary work).[18]

---

[18]The only case plaintiff cites in support of his argument
is an unpublished decision that found that the failure to include
the use of a cane in a hypothetical to an expert was a material
omission requiring remand (Pl. Mem. at 8, citing Suarez v.
Colvin, 13 Civ. 5236 (LTS) (GWG), slip. op. at 21-22 (S.D.N.Y.
Oct. 1, 2014) (Gorenstein, M.J.) (Report & Recommendation),
adopted by, slip. op. (S.D.N.Y. Nov. 10, 2014) (Schofield,
D.J.)).  In that case, however, it was undisputed that the
plaintiff was prescribed a cane by her doctor and there was
evidence that the plaintiff could not use her free hand to carry
small objects.  There is no such undisputed evidence here.

Further, although the ALJ does not provide an in-depth analysis of plaintiff's use of assistive devices, the ALJ considered plaintiff's ability to walk and incorporated those limitations supported by the medical record in his RFC determination. During the hearing, the ALJ questioned plaintiff and his attorney about plaintiff's use of assistive devices, including whether such assistive devices were prescribed by a doctor and whether they were prescribed for temporary or long term use (Tr. 30-31, 35-38). The ALJ also allowed plaintiff's attorney to supplement the record with evidence showing that plaintiff was prescribed an assistive device and that it was medically necessary (Tr. 35-37, 213, 559-61). Plaintiff's attorney submitted only a receipt reflecting plaintiff's purchase of a rollator in August 2012 (Tr. 559-61). The ALJ also addressed plaintiff's use of an assistive device in his decision. The ALJ noted that a social security employee observed that plaintiff walked with a cane (Tr. 17), that plaintiff was prescribed a stroller in 2012 (Tr. 18) and that plaintiff testified that he walked only with assistance (Tr. 20). The ALJ found, however, that plaintiff's allegations regarding the severity of his conditions were not supported by the medical record (Tr. 19-20). The ALJ found that the medical record showed that plaintiff's "overall standing balance was consistently fair with a good sitting balance," and that he could

"do sedentary work with a sit-stand option" (Tr. 20, <u>citing</u> Tr. 550-54; <u>see also</u> Tr. 20 ("In consideration of the claimant's Hopkin's [<u>sic</u>] lymphoma, in remission and lumbar disorder, he is limited to sedentary work with postural limitations with the ability to change position once every 30 minutes")).  The foregoing demonstrates that the ALJ gave adequate consideration to plaintiff's use of an assistive device to walk.  <u>See Podolsky v. Colvin</u>, <u>supra</u>, 2013 WL 5372536 at *16 ("Although the ALJ does not provide an in-depth analysis of [the plaintiff's] cane use, his decision does reflect a consideration of [the plaintiff's] ability to ambulate."); <u>Francois v. Astrue</u>, 09 Civ. 6625 (HB), 2010 WL 2506720 at *8 (S.D.N.Y. June 21, 2010) (Baer, D.J.) (concluding that ALJ properly considered plaintiff's use of a cane where "she note[d] in her review of the medical evidence the observations . . . that plaintiff could walk without the use of the cane, and specifically considers the use of a cane at other points in the transcript as well").  This assessment reflected plaintiff's limitations that were supported by the medical record described above and was not erroneous.[19]

---

[19]Notably, SSR 96-9p does not preclude a finding that an individual who uses an assistive device to walk can perform sedentary work.  <u>See Podolsky v. Colvin</u>, <u>supra</u>, 2013 WL 5372536 at *16 (while the use of a cane may impact the ability of a claimant to do <u>light or medium work</u>, there was substantial evidence in the record for the ALJ to have concluded that

<div align="right">(continued...)</div>

Thus, the ALJ's physical RFC assessment adequately took into account plaintiff's use of assistive devices.

### b.  Side Effects of
### Plaintiff's Medications

Plaintiff also argues that the ALJ erred in his RFC assessment because he did not consider the side effects of plaintiff's medications Prozac, Xanax and Zyprexa; specifically, that plaintiff's medications made him woozy, forgetful, drowsy, dizzy, nauseous and that he was "constantly shaking" (Pl. Mem. at 9, citing Tr. 33-34, 39-40, 410-14, 526-27, 531-32).  The Commissioner argues that the ALJ did consider plaintiff's testimony about the side effects of plaintiff's medications but correctly found that the testimony was not credible (Comm'r Mem. at 24-25).

The ALJ's determination that plaintiff's testimony about the side effects of his medication was not entirely credi-

---

[19](...continued)
Podolsky could perform sedentary work with his cane," citing Baker v. Comm'r of Soc. Sec., 384 F. App'x 893, 895 (11th Cir. 2010) (per curiam) ("Even an individual using a medically required hand-held assistive device can perform sedentary work, depending on the facts and circumstances of the case"); Staples v. Astrue, 329 F. App'x 189, 191-92 (10th Cir. 2009) (ALJ's error in relying on lack of prescription for cane in determination of claimant's RFC did not require remand because no indication that cane was medically necessary to perform light or sedentary work); Parker v. Sullivan, 91 Civ. 0981 (PNL), 1992 WL 77552 at *4-6 (S.D.N.Y. Apr. 8, 1992) (Leval, D.J.) (affirming ALJ's decision that claimant could perform sedentary work despite continued use of cane)).

ble was not erroneous because that testimony was contradicted by
plaintiff's other testimony and the objective medical record.
Although the ALJ did not discuss plaintiff's testimony about the
side effects of his medication in detail, the substance of the
ALJ's decision indicates that he did consider this testimony and
found that it was not credible.  See Mongeur v. Heckler, 722 F.2d
1033, 1040 (2d Cir. 1983) ("When, as here, the evidence of record
permits us to glean the rationale of an ALJ's decision, we do not
require that he have mentioned every item of testimony presented
to him or have explained why he considered particular evidence
unpersuasive or insufficient to lead him to a conclusion of
disability.").  In the discussion of the medical record and
plaintiff's testimony, the ALJ noted that plaintiff testified
"that his medication regimen affects his ability to complete
tasks" (Tr. 17).  The ALJ also concluded that plaintiff's "state-
ments concerning the intensity, persistence and limiting effects
of [plaintiff's alleged] symptoms are not entirely credible" (Tr.
19).  The ALJ's conclusion is supported for three reasons:
First, contrary to his assertions about the severity of the side
effects, plaintiff testified that after reporting side effects
from his medications to his doctors, his dosages were eventually
decreased -- his Prozac dosage was decreased from 80 mg to 40 mg,

and his Olanzapine dosage was decreased from 40 mg to 2.5 mg (Tr. 33, 40).

Second, the medical records that plaintiff cites in his papers in support of his arguments show that although plaintiff reported some side effects from his medications, they were either not severe or not continuous.  For example, plaintiff complained in April 2013 that Xanax "helped" but made him nauseous (Tr. 527).  One month later, in Dr. Fruitman's May 22, 2013 Mental Impairment Assessment, the doctor did not report that plaintiff's medications made him nauseous or cause stomach upset; rather, Dr. Fruitman noted that plaintiff's medications caused "dizziness" and "drowsiness" (Tr. 411).  Dr. Fruitman's treatment note from May 2013 also does not mention side effects from plaintiff's medications and instead indicates that Dr. Fruitman increased the dosage of plaintiff's Xanax prescription and continued his other medications (Tr. 526).

Finally, there are numerous notations in the medical record regarding plaintiff's medications indicating that plaintiff experienced either mild or no side effects; there are also notations that plaintiff's doctors increased the dosages of plaintiff medications, which would contradict plaintiff's claims that he was experiencing continuous severe side effects (see, e.g., Tr. 279 (January 27, 2012 note from Dr. Horwitz noting that

"after meeting with Psychiatry he now feels better and thinks
that his increased agitation may have been a side effect of his
medication. Pt reported that his thoughts of aggression are no
longer present."); Tr. 512 (March 27, 2012 note from Dr. Holland
stating that "[s]ide Effects of Medications:  Dose of Zyprexa
limited by QTC (could not increase above 5 mg)."); Tr. 532 (On
August 31, 2012, Dr. Fruitman increased plaintiff's dosages for
Zyprexa, Prozac and Xanax); Tr. 528 (On January 10, 2013, Dr.
Fruitman prescribed Zyprexa, Xanax, Prozac and Ambien and indi-
cated "No Side Effects Now"); Tr. 519 (On March 22, 2013, Dr.
Fruitman continued plaintiff's medications and noted that plain-
tiff reported that "Zyprexa helps") Tr. 557 (April 11, 2013 note
from Dr. Sardar stated that "patient DENIES any significant side
effect or complication from current prescribed medication" of
Percocet and Flexeril).

          Therefore, even if the ALJ erred in not explicitly
discussing the side effects of plaintiff's medication, the
substantial medical record demonstrates that the ALJ correctly
concluded that plaintiff's subjective complaints about the side
effects of his medications at the hearing were not credible and
unsupported by the objective medical record.  The ALJ therefore
did not err in omitting these alleged symptoms from his RFC
assessment.

3.   Summary

The ALJ's assessment of plaintiff's RFC was supported by substantial evidence and the ALJ's hypothetical to the vocational expert sufficiently incorporated plaintiff's mental and physical limitations.  The ALJ's reliance on the vocational expert's testimony that a person with the limitations in the ALJ's hypothetical could do work that existed in significant numbers in the national economy was, therefore, legally correct and supported by substantial evidence.

IV.   Conclusion

Accordingly, I conclude that the ALJ properly applied the applicable legal principles and that his determination that plaintiff was not disabled under the Act is supported by the substantial evidence in the record.  For all the foregoing reasons, plaintiff's motion for judgment on the pleadings is denied (Docket Item 18) and the Commissioner's cross-motion is granted (Docket Item 20).

Dated:  New York, New York
        September 29, 2016

SO ORDERED

HENRY PITMAN
United States Magistrate Judge

58

Copies transmitted to:

Natasha W. Teleanu, Esq.
Assistant United States Attorney
Southern District of New York
Third Floor
86 Chambers Street
New York, New York 10007

Daniel Berger, Esq.
New York Disability, LLC.
Suite 1-A
1000 Grand Concourse
Bronx, New York 10451